# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 05-324 (RJL)** |
| **v.** | : | |
| | : | |
| **TRACEY MCGUIRE** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |
| _____ | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its undersigned attorney, the United States Attorney for the District of Columbia ("the government"), respectfully submits this sentencing memorandum in preparation for the sentencing of defendant Tracey McGuire on October 13, 2006. The government recommends that the Court sentence the defendant under the United States Sentencing Guidelines ("the Guidelines"), at the lower end of the Guidelines range and at a Bureau of Prisons facility capable of addressing any possible mental health issues. The government submits that this would be a reasonable sentence.

## I. **Factual Background**

A.    The Procedural Facts

The defendant entered a plea on October 14, 2005 to one count of wire fraud in violation of 18 U.S.C. § 1343. In the Statement of Offense, which the defendant signed as part of her plea, she admitted that from about June 1998 through May 1993, she stole money from the commercial bank account of a Washington, D.C. dentist for whom she served as the de facto office manager. The defendant essentially wired money from the doctor's bank account to her

own bank account, altered the dentist's records to make the transfers to her look like credits owed to the dentist's patients and made use of a credit card machine as part of her scheme. As a result, the defendant acknowledged stealing, and has agreed to pay restitution, in the amount of $221,562.75.

The defendant acknowledged, in her plea agreement, understanding that she faced a maximum possible statutory sentence of twenty years imprisonment, a fine of $250,000 or more, a five year term of supervised release and an order of restitution, among other possible penalties.

The defendant also acknowledged in her plea agreement, which she signed, that the government believed she faced a possible sentence under the U.S.S.G. of a total offense level 15, which for her criminal history category of I, meant a possible period of incarceration from 18 to 24 months (2004 Guidelines). Under U.S.S.G. § 5B1.1, since the sentence is in Zone D of the Sentencing Table, the Guidelines do not authorize a sentence of probation. In short, under a Guidelines sentence, the defendant must serve some minimum period of time in jail and the minimum for her Level 15 range is 18 months in prison. The U.S. Probation Officer, in the revised Presentence Investigation Report dated December 29, 2005, likewise concluded that the defendant's U.S.S.G. total offense level would be 15, but under the 2005 Guidelines Manual.

The government submits that, since there is no difference in the level and sentencing range whether the defendant's sentencing is determined under the 2004 or 2005 Guidelines Manual, and thus no ex post facto issue, and the 2005 Guidelines Manual is the manual in effect at this time, the Court should, applying U.S.S.G. § 1B1.11.

Under the plea agreement, the defendant preserved her right to ask the Court for a downward departure under the United States Sentencing Guidelines. The plea agreement

specifically provides in paragraph 3 that "[f]urthermore, both parties reserve the right to allocute for departures from the guideline range." The government likewise reserved its full right of allocution in paragraph 6 of the agreement. The plea agreement made clear that there were no promises from the government to the defendant outside of the plea agreement and that the ultimate decision as to her sentencing was with the Court. The government anticipates that the defendant will be requesting a downward departure, but the government seeks no departure and opposes the defendant's request.

On October 14, 2005, at her plea, the Court released the defendant on her personal recognizance. Approximately three months later, on January 20, 2006, the defendant began seeing a psychiatrist located in Gaithersburg, Maryland named Dr. Laurence Greenwood. The defendant's counsel has provided the government with (1) a July 25, 2006 report from Dr. Greenwood on the condition of Ms. McGuire, (2) an August 2, 2006 report from Dr. Greenwood on the same; (3) an October 5, 2006 update; (4) the curriculum vitae of Dr. Greenwood and (5) the Discharge Summary from an in-patient admission of the defendant, Ms. McGuire, at the Psychiatric Institute of Washington, from April 25 to April 27. 2006.

The following is a discussion of the facts presented by the defendant pertaining to her medical condition which will likely form the basis for her request for a downward departure under U.S.S.G. §§ .

B.    The Defendant's Psychiatric Treatment

The evidence provided by the defendant concerning her psychiatric treatment since her plea in October 2005 is considerable. It is apparent from the documents that the defendant has been receiving regular treatment and dealing with certain psychological issues. The government

will not be calling an independent psychiatric expert to testify and, although intending to refer to the reports of Dr. Greenwood, does not intend to offer evidence to rebut it. The government will attempt to summarize this evidence below.

(1)    The July 25, 2006 Report from Dr. Greenwood

In this five page report, in letter form, Dr. Greenwood implores the Court not to sentence the defendant to incarceration.  He asserts that she is "severely mentally ill and a very dangerous suicide risk."  He further states that "[h]er thinking is psychotic and highly distorted, causing her to perform bizarre acts of self destruction.  Her suicidal preoccupation is longstanding and predates her current legal problems."

Dr. Greenwood asserts a number of facts supporting his conclusion that the defendant is a serious suicide risk.  First, he apparently saw the defendant for 62 visits prior to the report.  Second, he indicates that the defendant was previously diagnosed with a combination of Bipolar Disorder and Schizophrenic symptoms, as well as Posttraumatic Stress Disorder.  Third, he indicates that the defendant was hospitalized for psychiatric issues 30 times since age 16, primarily to prevent suicide.   Fourth, he indicated that she has been determined by the Social Security program to be disabled by mental illness.  Finally, he indicated that during the six months under his care, she needed two hospitalizations because she believed was acting on instructions to kill herself.

Dr. Greenwood indicated that the defendant is such a suicide risk that her fiancé has to keep her prescription pills.  He also indicated that she has attempted suicide before several times, including swallowing coins in an attempt to kill herself while at the day program visiting Dr. Greenwood in March 2006.  Dr. Greenwood detailed the defendant's long list of medicines and

-4-

noted that her mother had to come from New York to take care of her because of her psychiatric condition.

The government would note that Dr. Greenwood does not say that the defendant is mentally incapable of understanding her crime and its implications. Rather, he concludes that she understands it when he says that "Ms. McGuire deeply regrets her illegal actions." He further notes that "[s]he describes a situation which fell into her lap because her employer was considering plans for diverting his funds. She became tempted to help out her children by taking his money, and the process was so easy that it became a very bad habit. It was a little similar to amassing credit card debt. She knew it was wrong and kept wanting to stop."

<blockquote>(2)    The August 2, 2006 Report</blockquote>

In this five page report, with much of the same content as the July 2006 report, Dr. Greenwood again concluded that the defendant, Ms. McGuire, should not be sentenced to incarceration because she "is severely mentally ill and a very dangerous suicide risk." He again detailed the numerous drugs she was taking and his conclusion that she had symptoms of "depression, anxiety, insomnia, hypervigilance, and auditory hallucinations" and that he continued to see her several times a week.

In this report, Dr. Greenwood says that the defendant's fear of going to jail is but one of her reasons for considering suicide. He writes that "Ms. McGuire has many fears, both rational and irrational which contribute to her suicide risk. When she becomes desperate, as she does almost every week, she can see suicide as the only escape. Her fear of going to jail is one of multiple apprehensions, but it is significant."

<blockquote>(3)    The October 5, 2006 Report</blockquote>

In this three page report, Dr. Greenwood provided some additional information on the defendant's condition. He indicated that through August 2006, there appeared to be some progress in providing treatment to Ms. McGuire. He stated that it appeared to be caused, at least in part, by her continued psychiatric visits and reduced stressors over family and other issues. He also indicated that changing that a change in her prescription drugs to address a weight issue did not work and caused "a surge of hallucinations, insomnia, and intense irritability." Due to some other events, Dr. Greenwood concluded that "[a]t the present time, the patient's mental illness remains chronologically on the verge of being out of control." He also stated that "[h]er suicide risk remains intensely high, despite her desire to cooperate and control her impulses." Finally, he stated that "[t]he risk is markedly increased by her fears of incarceration and abandonment by hr fiancé. I am extremely concerned that she would [commit] suicide if she were incarcerated."

The government does not challenge the credentials of Dr. Greenwood as an expert psychiatrist. Nor does it dispute that the defendant, Ms. McGuire, may suffer from some form of mental illness and may consider suicide caused, in part, by her pending sentencing. However, the government concludes that the defendant's psychiatric illnesses pre-dated this crime and that the Bureau of Prisons can address these issues and that the Court should not deviate from what would be the most reasonable sentence in this case., a sentence within the United States Sentencing Guidelines range determined in the plea agreement and recommended by the probation officer.

The government addresses the likely downward departures sought by the defendant below:

II.     **Argument**

A.     The Court Should Deny a U.S.S.G. § 5H1.3 Departure Based on Mental and
Emotional Conditions

The defendant will likely seek a downward departure based on U.S.S.G. § 5H1.3 based

on mental and emotional conditions.  The language of this policy statement is as follows:

> Mental and emotional conditions are not ordinarily relevant in determining
> whether a departure is warranted, except as provided in Chapter Five, Part K,
> Subpart 2 (Other Grounds for Departure).
>
> Mental and emotional conditions may be relevant in determining the conditions of
> probation or supervised release, e.g., participation in a mental health program (see
> §§ 5B1.3(d)(5) and 5D1.3(d)(5).

U.S.S.G. § 5H1.3.

The D.C. Circuit has acknowledged that Section 5H1.3 is only to be used in extraordinary

circumstances.  United States v. Clark, 8 F.3d 839, 845-846 (D.C. Cir. 1993).  However, the only

circumstance which the Court addresses is that in which the defendant has suffered childhood

exposure to domestic violence.  The Court notes that several courts have accepted this as a basis

for a Section 5H1.3 departure.  Id at 846, citing United States v. Roe, 976 F.2d 1216, 1218 (9th

Cir. 1992); United States v. Vela, 927 F.2d 197, 199 (5th Cir.), cert denied, 502 U.S. 875 (1991).

But, again, it is not simply any allegation of child abuse or domestic violence, but rather

childhood abuse in "extraordinary circumstances."

A serious mental health condition alone is not grounds for a downward departure under

Section 5H1.3   See United States v. Derbes, 369 F.3d 579 (1st Cir. 2004).  In Derbes, the First

Circuit overturned a district judge who granted a 5H1.3 downward departure in part based on the

fact that the defendant had been seeing a psychiatrist for seven years and had contemplated

-7-

suicide.  The First Circuit noted that "our cases are stringent in distinguishing between serious mental health problems and a truly 'extraordinary case.'" Id. at 583.   The Court concluded that the defendant failed to provide sufficient justification for a downward departure where he could not show that he would not get his needed medication in the Bureau of Prisons.

Likewise, in United States v. Harpst, 949 F.2d 860 (6th Cir. 1991), the Sixth Circuit held that suicidal tendency was an improper basis for granting a downward departure under Section 5H1.3.   The Court noted that the federal Bureau of Prisons "is legally charged with the responsibility of providing adequate facilities and programs for suicidal inmates." Id. at 863, citing 28 C.F.R. § 552.41 (1991)("[e]ach Bureau of Prisons institution, other than medical centers, will implement a suicide prevention program which conforms to the procedures outlined in this rule. Each Bureau of Prisons medical center is to develop specific written procedures, consistent with the specialized nature of the institution and the intent of this rule").

The defendant has made no claim in this case that she cannot get her prescription psychiatric medicines in the Bureau of Prisons nor that she cannot get the type of treatment she has been receiving from Dr. Greenwood.  Absent such evidence, there is no real basis to claim a downward departure under Section 5H1.3.  Rather, the Court can and should sentence the defendant to a federal Bureau of Prisons facility, as determined by the Probation Officer, where the defendant can get such treatment.  The defendant's counsel can also recommend the same as can the government.  The government will further investigate and attempt to make such recommendation at sentencing.

     B.    The Court Should Deny a U.S.S.G. § 5K2.13 Departure Based on Diminished Capacity

The Court should likewise deny any request for a downward departure under U.S.S.G. §
5K2.13.  This section or policy statement suggests that a downward departure may be appropriate
if there is "diiminished capacity."   The section specifically provides:

> A downward departure may be warranted if (1) the defendant committed the
> offense while suffering from a significantly reduced mental capacity; and (2) the
> significantly reduced mental capacity contributed substantially to the commission
> of the offense.  Similarly, if a departure is warranted under this policy statement,
> the extent of the departure should reflect the extent to which the reduced mental
> capacity contributed to the commission of the offense.
>
> However, the court may not depart below the applicable guideline range if (1) the
> significantly reduced mental capacity was caused by the voluntary use of drugs or
> other intoxicants; (2) the facts and circumstances of the defendant's offense
> indicate a need to protect the public because the offense involved actual violence
> or serious threat of violence; (3) the defendant's criminal history indicates a need
> to incarcerate the defendant to protect the public; or (40 the defendant has been
> convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United
> States Code.

U.S.S.G. § 5K2.13.

The term "significantly reduced mental capacity" is defined in the application note to this
section as "the defendant, although convicted, has a significantly impaired ability to (A)
understand the wrongfulness of the behavior comprising the offense or to exercise the power of
reason; or (B) control behavior that the defendant knows is wrongful."

There is no claim by Dr. Greenwood in any of his reports that the defendant did not have
the capacity to understand the offense she was committing.  To the contrary, in his July 25, 2006
report, he stated that "Ms. McGuire deeply regrets her illegal actions."   He also then describes
the initiation of her crime of wire fraud, or stealing money from the dentist she worked for as
office manager, as an opportunity which fell into her lap which she wished she did not do.  This

clearly indicates a capacity to understand the crime at the time she committed it and the Court

should deny any request for a U.S.S.G. § 5K2.13 downward departure.

The Court should likewise order the defendant to pay the $221,562.75 which she agreed

to pay in her plea agreement.

## **CONCLUSION**

The Court should give the defendant a sentence under the U.S. Sentencing Guidelines at

the lower end of the sentencing range. The Court should likewise order that the defendant pay

restitution as agreed to. Finally, the Court should order that the Bureau of Prisons have the

patient examined by a BOP psychiatrist and that an analysis be done to determine which federal

prison is best suited to provide the medicine and care needed for the defendant's psychiatric or

emotional needs.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. BAR # 498610

By: _____
JAMES G. FLOOD (D.C. Bar #945435)
Assistant United States Attorney
for the District of Columbia
555 Fourth Street, N.W.
Washington, D.C. 20530
Phone: (202) 514-7131

-10-

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served by ECF filing upon the following counsel of record on the 6th of October 2006:

James N. Papirmeister, Esq.
Keiffer, Johnston & Papirmeister LLC
7127 Allentown Road, Suite 108
Fort Washington, Maryland 20744
Phone: (301) 248-7400
E-mail: jamespapirmeister@yahoo.com

_____

_____ JAMES G. FLOOD
ASSISTANT U.S. ATTORNEY