UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :
                                  :
                                  :
                                  :
             vs                   :    **Docket No.: CR-05-324-01**
                                  :    JUDGE: Richard J. Leon
                                  :    Sentencing Date:  Oct.13,2006
                                  :                      2:30 p.m.
                                  :
TRACEY MCGUIRE                    :                      FILED
                                  :

                                                OCT  6 2006

**DEPARTURE/VARIANCE & SENTENCING MEMORANDUM** NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

COMES NOW the Defendant, TRACEY MCGUIRE by and through her

attorney, James N. Papirmeister, Esq., of the Law Firm of

Keiffer, Johnston and Papirmeister, LLC, and hereby respectfully

submits this memorandum in support of her request for a downward

departure or variance from the Sentencing Guidelines and in aid

of her sentencing scheduled on October 13, 2006 at 2:30 p.m., as

a result of her guilty plea to a one-count Criminal Information

charging Wire Fraud, in violation of 18 U.S.C. §1343.

**FACTUAL BACKGROUND**

Forty-three(43) year old Tracey McGuire comes before this

Court in a state of severe mental and physical illness.  Most of

the past two and one half years, she has spent her time in a

psychiatric day treatment program or in Southern Maryland

Hospital, Prince George's Hospital, Sibley Memorial Hospital or the Psychiatric Institute of Washington, being treated for suicide attempts, epileptic seizures or physical collapses or bowel obstructions related to her suicide attempts or seizures. Her current treating psychiatrist, Dr. Laurence Greenwood, M.D., who has seen Tracey in her day treatment program over seventy (70) sessions since January of this year, and who has practiced Psychiatry over thirty-seven (37) years, declares that other than his patients who were successful in carrying out their suicides, Tracey McGuire is the "most severely suicidal patient I have ever treated." (Please see Dr. Greenwood's October 5, 2006 Addendum, his August 2, 2006 report, and his *curriculum vitae* under the tab "Dr. Greenwood, M.D., Reports & CV").

Tracey McGuire's tenuous mental health condition is compounded by her chronic seizure disorder and her recent stroke. While Ms. McGuire has a long history of mental illness, suicidal ideation and chronic seizures, her condition since May 2003, when these offenses were discovered and she left her job with Dr. Mazzuca, has precipitously deteriorated. She had her stroke in December 2003, must use a cane to walk because of partial paralysis, has recurrent and severe seizures, and has attempted suicide by overdosing on pills or swallowing coins numerous times in the last two years. She has been found by the

federal government as eligible, and is receiving, SSI benefits and is unable to be employed.

While Ms. McGuire's situation was not necessarily found to meet the test for "diminished capacity" under U.S.S.G. §5K2.13, we submit a fair consideration of this memorandum and the attachments, as well as the testimony of Dr. Laurence Greenwood, M.D., whom we intend to call as a witness at sentencing in this case, should result in either a downward departure under §§ 5H1.3 Mental and Emotional Conditions, 5H1.4 Physical Condition, 5K2.0 Multiple Circumstances, or a post-Booker guideline variance altogether, which would enable Ms. McGuire to avoid incarceration. We are mindful that a traditional pre-Booker application of the Guidelines disfavors departures for the aforementioned offender characteristics in all but the most exceptional cases, but we submit this case is far outside the heartland of typical cases. We are further mindful of the reluctance of federal courts to allow suicidal ideation to weigh at all in the context of a mental health departure, because of the difficulty in being able to separate the wheat from the chaff in ferreting out illegitimate claims. We also recognize the Bureau of Prisons can provide hospital care and has a suicide prevention program.

We submit, however, the medical evidence in this case is quite compelling in demonstrating that Tracey McGuire needs to

be in intensive psychiatric care virtually every day, requires emergency hospitalization virtually every month, and needs to have her extensive medicinal regime monitored daily, all of which is occurring now while she is free of incarceration. This is a situation which will only worsen, however, if she should be incarcerated. In other words, she is barely surviving now. If she becomes incarcerated, and thereby separated from her eleven year old son and her home, she will almost certainly deteriorate to a potentially catasptrophic point.

## THE MENTAL HEALTH ISSUE

Tracey McGuire's life has largely been a very unhappy and distressed one from her early childhood years. Her life has been replete with abandonment, physical and sexual abuse, and her resultant severe emotional disturbances. The attached report from Dr. Neil Blumberg, M.D., F.A.P.A., under the tab "Dr. Blumberg, M.D., Report & CV", summarizes under the sections on "Family History" and "Personal History" some of the highlights of Ms. McGuire's tribulations. Tracey's parents separated when she was eight years old. Tracey's biological father was an alcoholic and drug addict, spent time in jail, and later overdosed on heroin causing his death. Tracey had very difficult dealings with her mother, which included physical and

- 4 -

verbal abuse. She recalls being beaten by her mother with pots and pans, having her hand held over a fire for punishment, and being verbally berated, being called a "bitch" and a "whore". She recalls often being passed off to relatives as a child, including her paternal grandmother whose lesbian lover was verbally abusive, and an uncle in the U.S. Virgin Islands, with whom she went to live as a teenager, who repeatedly sexually molested her. When Tracey returned home to New York to resume living with her mother, their relationship suffered even more because of Tracey's loss of trust. (Please see the letter from Tracey's mother, Cora McGuire, under the tab "Cora McGuire", for her perspective on Tracey's traumatic childhood). Tracey's mother wound up marrying one William Lee, someone thirty years her junior, and just recently moved with him to Dumfries, Virginia. Tracey and her mother have improved their relationship over the past ten years.

Tracey had her first serious relationship with Herman "Bernard" Lowndes when she was eighteen (18) years old, and the couple had two children, Herman, who is 24, attending college in Tennessee, and Shanelle, who is 22, who lives in Prince George's County. Tracey and Bernard's relationship deteriorated due to his unemployment and infidelity. Tracey's subsequent relationships with men were problematic, including one with "Hayden", which included emotional and physical abuse, with

"Ronald", father of Tracey's eleven year old son "Malik", (and Ronald is currently incarcerated for breaking and entering), and the most recent relationship, with "Kenneth Trapp", who had largely been supportive, but who has been suspected of recently using drugs and may be separating permanently from Tracey as of this writing.

In addition to the sexual and physical abuse Tracey experienced as a child, she also reports being the victim of a rape by "Hayden" and a gang rape after leaving a night club in the District of Columbia. In the voluminous medical records we were able to obtain, copies of most all of which were provided to the Government on January 6, 2006, there is a notation in the 1991 records from George Washington University Hospital that Tracey was seen the previous Saturday at D.C. General Hospital for the report of a rape. We have not been able to get any records from 1991 from D.C. General, however.

Dr. Blumberg was provided with the voluminous medical records and discusses them in his report. There are numerous additional medical records from Tracey's admissions to hospitals in New York and the Washington area going back over twenty years which were either not provided by the institutions, were unable to be located, or the institution closed down. Nevertheless, the records that have been obtained reveal a compelling history of Tracey McGuire.

Under the tab "Alexandria Hospital" is an excerpt of medical reports and nursing notes from Tracey's hospitalization there sixteen years ago in 1989. The admitting note from April 28, 1989 describes her reports of auditory hallucinations, and notes her overdose of Tylenol #3, with three previous hospitalizations for suicidal drug overdoses. The admitting diagnosis was major depression with psychotic features and a history of seizure disorders. The admission note of March 22, 1989 reveals that Tracey ingested twenty-eight (28) 50 mg Benadryl capsules in an effort to end her life. Prior hospitalizations for suicide were noted at Jacobi Hospital in Bronx, New York, and at North Central Bronx Hospital, prior to her arrival in Alexandria, Virginia in late 1988 to live with her brother. Her background was recorded as indicating her father was an alcoholic, repeatedly jailed for stealing, and abused heroin. Her brother, with whom she attempted to reside in Alexandria was indicated to be alcoholic and abusive. Her aunt was indicated to have a history of schizophrenia.

In addition to the history of seizures, records at Alexandria Hospital were also noteworthy for Tracey's chronic constipation, with reports of no bowel movements for two weeks, and a history of multiple prior surgeries in New York to deal with bowel obstructions. The final diagnosis for the March 22,

1989 admission was "Major depressive episode with psychotic feature."

The nursing notes are also informative. The note for March 22, 1989 quotes Tracey as saying:

> I think if you're going to kill yourself you do it, if you don't it's a cry for help… I tried to tell people but they didn't listen to me… I've been depressed since I was 13… if you grow up hearing 'you're no good,' that's what you believe… I just need somebody to listen to me."

*Id.*.  It is further reported Tracey has few supportive relatives, is a loner and that "people always hurt me". *Id.*. It is further mentioned in the nursing notes of March 21, 1989, she has been depressed since she was a child, her family does not communicate, "everyone goes their own way," and that there was no one she could discuss her problems with. *Id.*.  Tracey's passive nature and her penchant for always trying to please everyone else was punctuated with her being quoted as saying:

> I have the right to say no and not feel guilty.  I'm so afraid I won't be needed or accepted and I needed to feel needed.

*Id.*.  Lastly, Tracey's admission note to the Alexandria Community Mental Health Center reports most of the aforementioned historical factors, including the difficulties with her family members, and that "her boyfriend in N.Y. had a drinking problem and beat her severely". *Id.*.

The records from Southern Maryland hospital are voluminous, but are aptly summarized in Dr. Blumberg's report, where he notes seven separate admissions of Tracey between October, 2003 and August, 2004, precipitated by seizure activity. Included under the tab "Shady Grove Hospital" is a discharge summary from August 31, 2004, where among other things, Tracey is diagnosed with "intractable seizures, possible psychogenic seizures, history of stroke, with right-sided weakness, chronic pain syndrome, prior history of small bowel obstruction..., hypertension, asthma and drug-induced neutropenia." *Id.*. The summary indicates Tracey was experiencing up to two seizures a day, one in the presence of her physician, with frequent convulsions, and required a transfer to George Washington University Hospital for continuous video and EEG monitoring. *Id.*.

Under the tab "Prince George's Hospital" are excerpts from three successive admissions of Tracey into their facility from June 14, 2005, June 15, 2005, and then June 30, 2005. The trauma note from Dr. Bijan Bahmanyar, M.D. notes Tracey was a resident of a nursing home and was found at the bottom of the stairwell with her neck tilted to the right, as a result of a fall down fourteen (14) steps due to a seizure and loss of consciousness. *Id.* A further consultative report from a Dr. Ahuja, M.D. notes Tracey had stopped her medication for a while

on the misguided advice of a woman who convinced Tracey to ingest some type of holistic juice, because the medicinal regime was not working. *Id.*. After a new medicinal regime was prescribed and a neurological consultation was recommended, just prior to her discharge on June 22, 2005, Tracey swallowed a stack of coins, and the discharge was canceled. In the attachments, you will further find a series of medical summaries and consultations, including actual sonogram pictures of numerous coins in, and subsequently, surgically removed from, Tracey's stomach. Lastly, under the Prince George's Hospital tab, you will find a discharge summary and psychiatric note regarding Tracey's resulting admission into the Prince George's Hospital Center psychiatric ward. She was there diagnosed with "schizoaffective disorder." *Id.*.

Dr. Blumberg's forensic psychiatric evaluation, as well as the referenced medical records note that Tracey is prescribed an extraordinary amount of medications. Dr. Blumberg, M.D., Report & CV, at p. 3. His psychological testing revealed Tracey "did not demonstrate any evidence of malingering." *Id.* at p.13. The results of the Millon Clinical Multiaxial Inventory-III (MCMI-III) suggested Tracey "had been exposed to an event or events in which a severe threat to her life may have occurred or that she had experienced a traumatic event that precipitated intense fear of horror. *Id.* "Currently, the residuals of this event appear

to be persistently re-experienced with recurrent and distressing recollections, as well as a tendency to avoid cues and recollections of such events." *Id.*.    Dr. Blumberg notes a suggested diagnosis based on the test results could include schizophrenia. *Id.*.    He further notes "her multiple medical problems increased in severity with the onset of hypertension, transient ischemic attacks and a stroke in 2003, leaving her with significant physical limitations." *Id.* at 14.

After considering medical records going back sixteen (16) years, the results of psychological testing, and taking a thorough history and mental status examination, Dr. Blumberg assessed Tracey McGuire, to a reasonable degree of medical certainty as of December 1, 2005, as well as at the time of the current offenses, as suffering from "major depressive disorder, recurrent, varying from mild to severe with psychotic features, post-traumatic stress disorder, chronic, cognitive disorder not otherwise specified due to head trauma, cerebrovascular accident (stroke), and personality disorder not otherwise specified with borderline features. *Id.*.    He also noted Tracey's numerous medical conditions, some of which he describes as "life-threatening" including the seizure disorder. *Id.* at 15.    While not finding her history of auditory hallucinations and other psychotic symptoms such as to have directly caused the criminal conduct in this case, he does note her involvement to have at

least been influenced by "her clinically significant depression, anger and resentment as a result of escalating financial debt, the financial needs of her children and her growing resentment of Doctor Mazzuca who psychologically resembled her emotionally abusive and abandoning parents." *Id.*.   He further notes that Tracey suffers from a "variety of clinically significant psychiatric and neurological disorders that compromise her thinking, judgment and impulse control." *Id.*.   He significantly states "to a reasonable degree of medical certainty, that Ms. McGuire is not malingering or deliberately exaggerating her emotional difficulties for the purpose of avoiding a more severe sentence in this case." *Id.*

Under the tab "Psychiatric Institute of Washington" (PIW), you will find excerpts from Tracey's recent hospitalizations there and at Sibley Memorial Hospital in April, 2006.   This includes a discharge summary which notes her admission for again swallowing about fifteen (15) coins in February, 2006, being transferred to Sibley from PIW after she developed "significant bilateral edema and face edema," and also noting she has some multiple personality issue, noting an alter ego named "Henry". *Id.*.   Her Axis I diagnoses included "major depressive disorder," "postraumatic stress disorder," and "dissociative identity disorder". *Id.*.

On an April 17, 2006 Psychological Assessment Update, it is noted "Patient reports continued 'voices'- identifies 'three I know of'- she reports her uncle's voice, her aunt's voice, and one she calls 'Henry". "Reports these voices berate her and tell her to harm herself. "She reports continued SI and plan to 'take my kids with me'". *Id.*.

The August 2, 2006 report and October 5, 2006 addendum both by Dr. Laurence Greenwood, M.D., provide a comprehensive summary of Tracey's mental and physical condition from the beginning of the year to this week. Tracey has had numerous additional suicide attempts, including more incidents of swallowing coins as well as overdosing on massive quantities of pills, and additional hospitalizations. *Id.*. Nevertheless, it is clear she is being monitored on a daily basis, with very careful assessment and management of her complicated medicinal regimen. There is a definite deterioration in her mental illness, which Dr. Greenwood notes in his October 5, 2006 report is "on the verge of being out of control". While there is no clear panacea for such an extremely severe and complicated mental health condition as is currently being experienced by Tracey McGuire, she is getting care on a daily basis at the Care Connection, in which she meets with Dr. Greenwood five days a week, and is frequently, and readily transported to hospitals on an emergency basis about every other week, it appears. At the very least,

she has her home to go to and her son she sees, and her mother and stepfather nearby in Dumfries, Virginia.

Dr. Greenwood, who has spent more time with Tracey McGuire than any other mental health professional in her life, all of which has taken place since January, 2006, declares as of October 5, that "her suicide risk remains intensely high," and is "markedly increased by her fears of incarceration and abandonment by her fiancé." *Id.*, at pp.2-3.    In his August 2, 2006 report he declares Tracey as "the most severely suicidal patient I have ever treated,"(*Id.* at p. 4) and concludes his October 5, 2006 report with his opinion that she would commit suicide if incarcerated. *Id.* at 3.

### POST-BOOKER ANALYTICAL FRAMEWORK

This Court advised counsel at the plea hearing in this case on October 14, 2005, that the sentencing memoranda should be crafted with arguments tailored to the sentencing factors and purposes set forth in 18 U.S.C. § 3553 (a), rather than the United States Sentencing Guidelines (USSG). The undersigned will follow that directive, but first, must discuss guidelines considerations in order to comport with 18 U.S.C. § 3553(a)(4), as well as the mandate of United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 756, 160 L.Ed. 2d 621 (2005).

A recent Fourth Circuit decision clarified that Circuit's view of the analytical framework to be followed with regard to applying the now advisory guidelines in light of the excision of 18 U.S.C.A. § 3553 (b)(1) wrought by United States v. Booker, *supra*. Apologizing in advance for the length of the following quotation, the recent decision in United States v. Hampton, 441 F. 3d 284, 286-288 (4th Cir, 2006), decided March 23, 2006, comprehensively presents the analytical framework the Fourth Circuit has laid out in United States v. Moreland, 437 F 3d 424, 432 (4th Cir. 2006) for sentencing decisions post-Booker, incorporating sentencing guideline policy statements and commentary, traditional departure analysis as directed by the Fourth Circuit in United States v. Rybicki, 96 F. 3d 754, 757-75 (4th Cir. 1996), and analysis of 18 U.S.C.A. §3553(a) sentencing factors.

> *Booker* instructs sentencing courts to make individual sentencing decisions grounded in all of the factors set forth in 18 U.S.C.A. §3553 (a). *Id*. One of these factors is "the kinds of sentence and the sentencing range established" by the now-advisory guidelines. 18 U.S.C.A. §3553(a)(4). Sentencing courts must therefore still "take account of" the now-advisory guidelines in post-*Booker* sentencing. 125 S.Ct. at 764. Indeed, we have directed that when sentencing a defendant, a district court, after making appropriate findings of fact, must initially calculate the proper guideline range. *United States v. Hughes*, 401 F. .3d 540, 546 (4th Cir. 2005). A court must consider this range, along with the other factors set forth in §3553(a), in determining an appropriate

sentence in each case. *Booker*, 125 S.Ct. at 757; *Hughes*, 401 F .3d at 546-47.

Thus, after determining the advisory guideline range, a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need "to reflect the seriousness of the offense," provide "just punishment," "afford adequate deterrence," "protect the public," and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C.A. §3553(a). *See also United States v. Green*, 436 F .3d 449, 455-56 (4th Cir. 2006). Only sentences that "reflect" these §3553(a) factors-whether falling within or outside the guideline range-comply with Congress's statutory mandate. See *Booker*, 125 S.Ct. at 765.

In determining if a sentence "serves the factors set forth in §3553(a)," a court should determine, after calculating the initial guideline range, whether a traditional upward or downward departure under the guidelines would be appropriate; if so, the court may depart accordingly. *United States v.Moreland*, 437 F.3d 424, 432 (4th Cir.2006). [FNI] If after this consideration the sentence rendered does not serve the §3553 (a) factors, a court may impose a "variance sentence," i.e., a sentence not within the advisory guideline range. The court may impose this variance sentence provided that the sentence falls within the statutory limits for the underlying offense and is "reasonable." Id.; *Green*, 436 F.3d at 456. But the sentencing court must adequately explain the reasons for the variance. *Hughes*, 401 F.3d at 546.

FNI. A district court may grant a "traditional" downward or upward departure if it finds an aggravating or mitigating factor of a kind or a degree that the Sentencing Commission did not consider applicable to the "heartland" of cases. *Koon v. United States*, 518 U.S. 81, 92-

94, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).
Such departures will generally be based on
encouraged factors-those the Commission
recognized the guidelines did not fully take
into account-but departures may also be based
on discouraged factors-those the Commission
considered and deemed irrelevant to the
determination of most sentences. *Id.* at 94-95,
116 S.Ct. 2035. Departures based on discouraged
factors, however, are appropriate only in
"exceptional" cases. *Id.* at 95, 116 S.Ct. 2035.

The reasonableness of any given sentence will
largely depend upon the specific facts of each
case and the district court's consideration and
application of the §3553(a) factors to those
facts. *Moreland*, 437 F.3d at 433. In
considering whether a sentence is unreasonable,
we will review the district court's legal
conclusions *de novo* and its factual findings
for clear error. *Id.*

We recently explained that "[a] sentence that
falls within the properly calculated advisory
guideline range is entitled to a rebuttable
presumption of reasonableness." *Id.* This is not
to say that a sentence falling outside of the
guideline range is automatically unreasonable;
rather, the reasonableness of a variance
sentence will depend upon whether a variance
was proper in light of the facts of the
particular case at hand, as well as whether
those facts support the degree of the variance
granted. *Id.* at 433-34.

If the district court's justifications for the
variance sentence "are tied to §3553(a) and are
plausible," we will uphold the sentence as
reasonable. *Id.* at 434. "However, when the
variance is a substantial one, …we must more
carefully scrutinize the reasoning offered by
the district court in support of the sentence.
The farther the court diverges from the
advisory guideline range, the more compelling
the reasons for the divergence must be." *Id.*
See also *United States v. Dean*, 414 F.3d 725,

729, (7th Cir.2005); *United States v. Dalton*,
404 F.3d 1029, 1033 (8th Cir.2005).

United States v. Hampton, *supra* at 286-288.  In Tracey McGuire's
case we submit that a departure would be warranted even under
the more restrictive traditional guidelines analysis, which
serves to underscore and buttress that a post-Booker § 3553(a)
analysis would easily warrant a variance from the Guidelines,
without a strained or even difficult application of § 3553 (a)
to the compelling facts in this sentencing.


## DEPARTURE OR VARIANCE?


In  Tracey  McGuire's  case,  we  believe  the  facts  are
exceptional enough for the Court to grant a five-point departure
for the "disfavored" offender characteristics under U.S.S.G.
§5H1.3 "Mental and Emotional Conditions," §5H1.4 "Physical
Condition" or the combination of both as outlined in the policy
statement of §5K2.0(a)(4) for "multiple circumstances".  A five
point departure would place Tracey McGuire's case in Zone B of
the Sentencing Table, allowing the Court to impose a sentence of
probation,  which includes a period of home detention pursuant
to U.S.S.G. § 5B1.1(a).

The "Introductory Commentary" to part H of Chapter Five of
U.S.S.G. dealing with "Specific Offender Characteristics", which

- 18 -

includes mental and emotional conditions as well as physical condition, notes that these characteristics, among others, "are not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range. *Id.*. On the other hand, it is also noted:

> ...although these circumstances are not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range, they may be relevant to this determination in exceptional cases. They also may be relevant if a combination of such circumstances makes the case an exceptional one, but only if each such circumstance is identified as an affirmative ground for departure and is present in the case to a substantial degree. <u>See</u> §5K2.0 (Grounds for Departure).

*Id.*. Indeed, the Policy Statement for § 5H1.3 states "Mental and emotional conditions are not ordinarily relevant in determining whether a departure is warranted, except as provided in Chapter Five, Part K, Subpart Remember 2 (Other Grounds for Departure). Id.. Turning to § 5K2.0 (a), we learn in subsection (a)(1), "IN GENERAL.- The sentencing court may depart from the applicable guideline range if-

> ...(4) DEPARTURES BASED ON NOT ORDINARILY RELEVANT OFFENDER CHARACTERISTICS AND OTHER CIRCUMSTANCES.-An offender characteristic or other circumstance identified in Chapter Five, Part H (Offender Characteristics)or elsewhere in the guidelines as not ordinarily relevant in determining whether a departure is warranted may be relevant to this

> determination      only   if    such    offender
> characteristic    or    other    circumstance    is
> present to an exceptional degree.

*Id.*.   Thus, if Tracey McGuire's mental and emotional condition

can qualify as "exceptional", then a downward departure on this

basis   alone   would   be   within   the   traditional   guidelines

parameters. More on whether this case would so qualify, will be

discussed, below.

Turning   our   attention   to   §   5H1.4,   the   policy   statement

declares "Physical condition or appearance, including physique,

is not ordinarily relevant in determining whether a departure

may be warranted. "However, an extraordinary physical impairment

may   be   a   reason   to   depart   downward;   e.g.,   in   the   case   of   a

seriously infirm defendant, home detention may be as efficient

as, and less costly than, imprisonment." *Id.*.   Keep in mind the

aforementioned provision in § 5k2.0 (a)(4) also applies since

this offender characteristic of physical condition is one not

"ordinarily"   relevant,   but   could   be   if   present   to   an

"exceptional" degree.   *Id.*.   Thus, if such physical condition

qualifies as either "extraordinary" or "exceptional", then a

departure can be granted for physical condition even under a

traditional pre-<u>Booker</u> mandatory guidelines calculus.   There is

another relevant traditional departure basis applicable to this

case.

- 20 -

The policy statement under § 5K2.0 delineates the requirements for a so-called multiple circumstances departure.

> (c) LIMITAION ON DEPARTURES BASED ON MULTIPLE CIRCUMSTANCES-
> The court may depart from the applicable guideline range based on a combination of two or more offender characteristics or other circumstances, none of which independently is sufficient to provide a basis for departure, only if-
>
>> (1) such offender characteristics or other circumstances, taken together, make the case an exceptional one; and
>>
>> (2) each such offender characteristic or other circumstance is-
>>
>>> (A) present to a substantial degree; and
>>>
>>> (B) identified in the guidelines as a permissible ground for departure, even if such offender characteristic or other circumstances is not ordinarily relevant to a determination of whether a departure is warranted.

United States Sentencing Guidelines Manual, §5K2.0(c) (November 1, 2005 Ed.). The "Commentary" to § 5K2.0 further explicates the application of all three of the aforementioned bases of departure, the Mental and Emotional Conditions characteristic, the Physical Condition characteristic and the "multiple circumstance" situation:

> (C) Departures Based on Circumstances Identified as Not Ordinarily Relevant.-Because certain circumstances are specified in the guidelines as not ordinarily relevant to sentencing (see, e.g., Chapter Five, Part H (Specific Offender

Characteristics)), a departure based on any one of
such circumstances should occur only in exceptional
cases, and only if the circumstance is present in
the case to an exceptional degree. If two of more
of such circumstances each is present in the case
to a substantial degree, however, and taken
together make the case an exceptional one, the
court may consider whether a departure would be
warranted pursuant to subsection (c). Departures
based on a combination of not ordinarily relevant
circumstances that are present to a substantial
degree should occur extremely rarely and only in
exceptional cases.

In addition, as required by subsection (e), each
circumstance forming the basis for a departure
described in this subdivision shall be stated with
specificity in the written judgment and commitment
order.

*Id..* We submit, Tracey McGuire's mental health condition, which

is teetering on the edge of catastrophe, in and of itself,

qualifies as exceptional to warrant a departure solely on the

grounds of her mental state. When considered in combination

with her physical condition, including her chronic and

debilitating seizure disorder, her stroke, and her repeated

bowel obstructive issues, her situation is viewable as truly

exceptional. Putting her in prison, with this extraordinary

level of mental frailty, and physical discomfort seems unduly

harsh and unwarranted.

Numerous cases can be found where courts throughout the

country have granted downward departures based on mental and

emotional conditions of the accused. (See cases analyzed in

Federal Sentencing Law and Practice, (FSLP), § 5H1.3, Hutchison, Hoffman, Young and Popko, (2006 ed.), including U.S. v. Lara, 905 F.2d 599,601(2d Cir.1990), U.S. v. Parish, 308 F.3d 1025,1031 (9th Cir. 2002), U.S. v Lighthall, 389 F.3d 791 (8th Cir. 2004), and U.S. v. Garza-Juarez, 992 F.2d 896 (9th Cir. 1993), to name a few. In *dicta* the District of Columbia Circuit would endorse such a departure even pre-Booker:

> Finally, the district court may want to contemplate whether Clark's childhood exposure to domestic violence is sufficiently extraordinary to be weighed under U.S.S.G. § 5H1.3, which states that mental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable Guidelines range……We recognize that several of our sister circuits have indicated that § 5H1.3 allows courts to consider childhood abuse as a basis for departure in extraordinary circumstances……On remand, the district court will have the opportunity to flesh out its factual findings regarding Clark's disadvantaged childhood in this regard.

United States v. Clark, 8 F.3d 839, 845-6 (U.S.App.D.C. 1993), citations omitted.

As far as a traditional departure analysis, we make clear we are not suggesting or arguing for a consideration of Tracey McGuire having "diminished capacity" under U.S.S.G. §5K2.13, as such is not borne out by the evaluation by Dr. Blumberg or the facts in this case. We are also mindful of the reluctance of

federal courts to find suicidal tendencies as a sufficient basis to depart under §5H1.3 United States v. Harpst, 949 F. 2d 860, 863-864 (6th Cir. 1991).

> A holding by this court embracing downward departures due to suicidal tendencies would, we fear, result in such claims becoming virtual boilerplate in defendants' arguments before sentencing judges. Having to separate the wheat of valid claims from the chaff of disingenuous ones is a path before which we give serious pause.

*Id.* at 863. Nevertheless, there are situations where such claims can be legitimate. In Harpst, the defendant's claim was found to be weak, because the evidence adduced was that the suicidal tendency of Harpst had abated, the psychiatrist noted Harpst's prognosis was "good", and Harpst never actually claimed he might take his life if incarcerated. Id. at 863-864.

Our case is much stronger. We dare submit, this case has the most extreme and legitimate suicidal ideations imaginable. Next to Tracey actually being successful at killing herself, her history shows nearly twenty years of gravely serious and destructive suicide attempts, with her current behavior signaling an all-time high, in that she has swallowed coins or pills in an effort to end her life over a half-dozen times in the last fifteen (15) months. This behavior is in contemplation of incarceration, and concomitant with the exacerbation of her seizure disorder, chronic bowel issues and a stroke.

We maintain that Tracey McGuire's mental condition alone meets the test of exceptionalness required for a substantial § 5H1.3 departure.   At the very least, her mental condition, combined with her physical disorders should collectively warrant a departure under the "multiple circumstances" ground, because her mental illness and physical disabilities are present to at least a "substantial degree" and when considered together, also make this case exceptional.  §5K2.0(C), *supra*.

Another Guideline factor present to some extent, is § 5H1.6 "Family Ties and Responsibilities".   Especially   now that Tracey's boyfriend is apparently moving out of the family home, there would be no adult to care for Tracey's eleven year old son, Malik, who has been going through his own rough times, having suffered from severe bullying and taunting at his school. He was actually declared to be suicidal about two years ago. Tracey's incarceration would result in Malik having to live with extended relatives.   He has bonded extensively with his mother, is not used to being away from home or his neighborhood.   This would cause him to have to live with relatives with whom he is not that close, move out of his room, house and neighborhood, and likely, the State of Maryland.   While this is by no means the primary ground for departure, it is a factor the Court should take into account in its decision in this case. (See  the "Commentary" and "Application Note" which follows U.S.S.G. §

5H1.6 for the factors to consider in deciding whether to apply a departure based on this additional "disfavored" offender characteristic).

There is one other guideline consideration which the undersigned notes to this Court, with some misgivings, because it is unrelated to the overwhelming issue of Tracey McGuire's deplorable mental health. It is the undersigned's strong impression that Dr. Mazzuca, the so-called victim, does not at all deserve such a stature in this case. Dr. Mazzuca was himself engaged in numerous and extensive fraudulent schemes to hide income, skim income, avoid paying taxes, and commit perjury and fraud on the Bankruptcy Court. This is more fully set out in Tracey's statement in the Presentence Report. Dr. Mazzuca is believed to have accumulated a very substantial amount of money in his practice. One of his schemes to hide assets and earnings involved his literally teaching Tracey how to commit this crime that is involved in this case. As set forth in the statement by Tracey, she had no idea or inkling how to do the returns on these credit card payments, until Dr. Mazzuca discussed it with her, the same way he discussed how she should take home his clients' checks and not deposit them until the following month. There is a guideline factor under § 5K2.10 for "victim's conduct". "If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may

reduce the sentence below the guideline range to reflect the nature and circumstances of the offense." *Id.*. While the guideline would not usually be relevant as to non-violent offenses, "There may, however, be unusual circumstances in which substantial victim misconduct would warrant a reduced penalty in the case of a non-violent offense. "For example, an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation." Id.

It is at least arguable that Dr. Mazzuca's mandate that Tracey arbitrarily charge fees to his clients in order that he make a predetermined amount of money on a given week, such as the typical $25,000, could, when combined with the other things Tracey outlined in her statement, constitute provocation and harassment. Also, it must be mentioned that Dr. Mazzuca's claim Tracey caused him financial ruin could not be further from the truth. His office was in financial disarray, when Tracey first started working there. Despite the large amount amount of money he made, he squandered it on personal luxuries and trips. The financial disarray was the reason Dr. Mazzuca cooked up all his fraudulent schemes and filed bankruptcy, as well. We do not have corroborative evidence to present in support of a departure on this basis, as the current employee of Dr. Mazzuca, who witnessed Mazzucca's *modus operandi,* refused to talk with my investigator. Neither Detective Tucci, who was informed of

Mazzuca's fraud upon my first contact with him on July 30, 2003, nor the Government, who was also advised of all his schemes upon our initial debriefing, expressed any interest in investigating Dr. Mazzuca for wrongdoing.

We simply ask the Court give the issue some weight in your analysis of the case. The gravamen of our sentencing posture is still the deleterious health issue faced by Tracey McGuire.

### *A VARIANCE UNDER § 3553 (a)*

Of course, this Court could always find Tracey McGuire's mental condition or physical condition not exceptional either individually or collectively, and find an insufficient basis for departing downward. In consideration of Booker, *supra,* and the totality of factors in 18 U.S.S.A. §3553(a), however, as well as the purposes to be advanced by any sentence imposed, the Court could grant a variance from the sentencing range determined by the guidelines. Hampton, *et.al.*, *supra*. Keep in mind, §3553 (a) mandates the court "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth…" in the statute, namely,

> (A) to reflect the seriousness of the offense, promote respect for the law and provide just punishment,
>
> (B) deterrence,

(C) protection of the public, and

(D) to provide the defendant with needed (in this
case) medical care or other correctional treatment.

*Id.*, paraphrasing original.

In the *Hampton* case, cited *supra*, the Fourth Circuit rejected the District Court's indirect §5H1.6 "Family Ties and Responsiblities" departure consideration,(a disfavored departure ground, as are mental/emotional condition and physical condition), which the District Judge couched as a variance, because even though Hampton was a so-called "sole custodial parent" of two small children, his mother was available to care for them, as she had been so doing, Hampton was not dutifully paying child support for his other two children, and the sheer magnitude of the variance, from a guideline range of 57 to 71 months imprisonment, down to probation, was not considered as reasonable. *Hampton*, 441 F.3d at 288 to 289.

It should be mentioned that the departure at issue in *Hampton* amounted to a fifteen-level departure, which factored heavily in the Fourth Circuit's analysis. *Id.* at 288.    Judge Diana Gribbon Motz, the author of the opinion, also wrote a concurring opinion to emphasize that such a large variance was not *per se* unreasonable under §3553(a)and that consideration of a defendant's personal characteristics and history is proper. *Id.*at 289. She further pointed out that "there will undoubtedly

- 29 -

be cases in which a sizable variance sentence better serves the §3553(a) factors," and that "automatic application of the guidelines without proper consideration of the other §3553(a) factors would contravene Booker's mandate." *Id*.   The District judge, she explained, failed to consider Hampton's prior convictions, his pending charges, his child support arrearages, and his inconsistent employment history, and gave excessive weight to a single §3553(a) factor, and the paucity of reasons fell "far short of justifying a variance of such a magnitude." *Id*.

The first of the § 3553 (a) factors to be considered by the Court, is the nature and circumstances of the offense.   The offense in this case was non- violent. We have extensively discussed the history and characteristics of Tracey McGuire. Dr. Blumberg opined that Tracey's involvement appears to be directly influenced by her clinically significant depression, anger and resentment as a result of escalating financial debt, the financial needs of her children, and her growing resentment of Dr. Mazzuca who was abusive to his patients, and in some ways Tracey.   The most overriding characteristic of the Defendant Tracey McGuire, is her absolutely overwhelming, and desperate state of mental illness.   She is on the edge in terms of living her life.   She seems to inch ever closer to death.

Incarcerating her is likely to push her over the edge. Her psychiatrist believes she could not take it.

Tracey's reaction to the discovery of her crime, her termination from her job, her stroke, her disability from ever being able to work again, and her overall deterioration from May 2003, until the present time, which includes numerous hospitalizations, seizures, and suicide attempts, certainly show she is taking this case extremely seriously. This is so much so, that it has been questionable whether she would even make it alive to her sentencing. It is a substantial fraud, yes. In Tracey McGuire's case, however, the seriousness of the offense has been reflected in how punishing she has already been to herself in just trying to cope with the ramifications of her offense. In other words, in Tracey's shoes, she has been brutally punished by her misdeeds, and she is imploding. In her case a sentence of probation with home detention is "sufficient, but not greater than necessary" to achieve the aforementioned purposes of sentencing. § 3553 (a). She is almost destroyed as a functioning person right now, and we have not even had the sentencing hearing yet.

As for deterrence, that should be a factor of lesser importance in this case, because this case has not been publicized, it was a small office involved and not many people appear to be aware of the crime, and there are no codefendants.

- 31 -

The public is highly unlikely to experience any further crimes from Tracey, in that she is permanently disabled, and will be unlikely to ever work again, and has nothing but catatonic fear about ever putting herself in this position again.   Dr. Greenwood believes there is virtually no chance Tracey will ever become involved in a crime again. Dr Greenwood, report of August 2, 2006, p.5.

As far as the need for the sentence to provide Tracey with medical and psychiatric care, this factor is of overriding importance in this case.  She is unlikely to be able to tolerate being in prison at this point in her life.  She needs to be in a day treatment program, with extensive counseling and medicinal therapy on a daily basis, as well as have the ready availability of in-patient psychiatric wards, as well as the psychiatric Institute of Washington.  She needs to see her son and daughter on a daily basis, as well as her Mother frequently, all of whom she needs for emotional support.  She needs to try and recover in her own home, in her own neighborhood, so as not to exacerbate her already fragile emotional state.  With her mental illnesses, chronic seizures, and chronic bowel obstructions, she would be tortuously uncomfortable in any prison setting.  It would arguably be inhumane at this point to incarcerate this pathetic woman.

We have already discussed the kinds of sentences available, if this court grants a five (5) point departure or variance. It would allow for a sentence of probation, with home detention. Such would allow Tracey to live at home, be with and care for her son and daughter, be in her neighborhood, have the contact with and support of her other son, as well as her mother, and attend to all the appropriate mental and medical health services. Such a sentence would be sufficient, but not greater than necessary, to achieve all these worthwhile goals. § 3553 (a).

We have already considered how a departure for mental and emotional condition, and physical condition, as well as a multiple circumstances departure, is strongly supported by the facts and evidence in this case. The application of these guideline departure grounds, and the related commentary and policy statements, to the facts of this compelling case, dutifully serves the sentencing purposes outlined in §3553 (a).

There have been other economic crime cases, even with an amount of loss in excess of two hundred thousand dollars, where probation was given, for one compelling reason or another. The reasons supporting the departure in this case are the highly unusual and extremely rare severity of this patient's mental health problems, combined with her physical infirmities.

Restitution must be ordered in this case, and a sentence of home detention could afford Ms. McGuire the ability to make payments over the life of her term of probation or supervised release, and a civil, renewable judgment can be enforced for the balance owed.

### CONCLUSION

For all the foregoing reasons, it is respectfully prayed that this Court grant a five-point downward departure, either under §§ 5H1.3, 5H1.4, 5H1.6, 5K2.0, 5K2.10, or a variance from the guidelines, in order to bring Tracey McGuire's case within Zone B of the sentencing table, allowing her to be sentenced to probation, with home monitoring. A fair and proper consideration of the guidelines provisions, commentary and policy statements, and the factors set forth in 18 U.S.C. § 3553 (a), all result in such a sentence effectively serving the appropriate purposes of sentencing as mandated by Congress.

Respectfully submitted,

James N. Papirmeister, Esq.
Keiffer, Johnston & Papirmeister, LLC
7127 Allentown Rd. Suite 108
Ft. Washington, Maryland 20744
(301)248-7400
D. C. Bar No. 421-366

- 34 -

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2006 I hand-delivered copies of this Sentencing Memorandum with attachments to James G. Flood, Assistant United States Attorney, 555 4th Street, N.W. Washington, D.C. 20530, and to LaVerne A. Ebron U.S. Probation Officer, U.S. Courthouse, 333 Constitution Avenue, Nw, Room 2800, Washington, D.C. 20001.

James N. Papirmeister, Esq.